UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                        CRIMINAL NO. 06-20185

        v.                                DISTRICT JUDGE VICTORIA A. ROBERTS

MICHAEL ELDREN BRACEY (D-3),    MAGISTRATE JUDGE VIRGINIA M. MORGAN

        Defendant.
_____/

## REPORT AND RECOMMENDATION

### I. Introduction

In this case, defendant, along with four co-defendants, is charged in an Indictment with Conspiracy to Use Interstate Commerce Facilities in the Commission of Murder for Hire in violation of 18 U.S.C. § 1958 (D/E #1). This matter comes before the Court on Defendant Michael Eldren Bracey's Motion to Suppress Statements (D/E #138) and Supplemental Brief in Support of Defendant's Motion to Suppress Statements (D/E #169). The government filed a response in opposition to defendant's motion (D/E #188). On January 15, 2009, this Court held a hearing on defendant's motion and, at that hearing, both defendant and the government agreed that an evidentiary hearing was unnecessary and that this motion could be decided on the evidence and arguments submitted by the parties. For the reasons stated below, this Court recommends that defendant's motion to suppress statements be **DENIED**.

-1-

**II. Background**

In this case, defendant, along with four co-defendants, is charged in an Indictment with Conspiracy to Use Interstate Commerce Facilities in the Commission of Murder for Hire in violation of 18 U.S.C. § 1958 (D/E #1). As a preliminary matter, this Court would note that, included among the evidence relied upon by the parties, are documents relating to another case. In Cr. No. 07-20606, before the Honorable Nancy G. Edmunds, defendant was charged in a three-count Indictment with Possession with Intent to Distribute Crack Cocaine in violation of 21 U.S.C. § 841(a)(1), Possession of Firearms in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A), and Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g). Defendant filed a motion in that case seeking to suppress the statements taken on April 13, 2006, and that motion is substantially similar to the motion to suppress pending in this case. On June 26, 2008, Judge Edmunds held a hearing on the motion and subsequently denied it. On July 31, 2008, in Cr. No. 07-20606, a jury found defendant guilty of possession with intent to distribute 50 grams or more of cocaine base; of possessing a firearm in furtherance of a drug trafficking offense; and of being a felon in possession of a firearm.

**A. Factual Background**

On December 27, 2005, defendant was shot at least nine times: twice in the left thigh, twice in the right thigh, and four times in the perinal (pelvic) region. (Tr. 11, 98)[1] Defendant

---

[1] All citations to a transcript refer to the transcript of the evidentiary hearing held by Judge Edmunds in Cr. No. 07-20606. In this case, the transcript is attached as Exhibit A to the Government's Response to Defendant's Motion to Suppress.

was not shot in the head, but he did report that he believed he had been pistol whipped in the head. (Tr. 26-27, 135-136)

Defendant's right proximal femur was fractured and he was transported to the Emergency Room at Detroit Receiving Hospital for treatment. (Tr. 9-10) On December 28, 2005, Dr. Robert Krugel, an orthopedic surgeon, performed a surgery in an attempt to repair defendant's right femur. (Tr. 7, 9, 12) During that surgery, Dr. Krugel placed a metal rod into defendant's leg. (Tr. 12-13) Defendant was later discharged from the hospital and given a prescription for Percocet. (Tr. 13-14, 99)

On January 20, 2006, defendant was admitted to Detroit Receiving Hospital complaining of pain and an x-ray revealed that the metal rod that was in his femur had started moving and cutting out from the top part of defendant's bone. (Tr. 15) Dr. Krugel performed another surgery on defendant by removing the metal rod from defendant's femur and placing a "metal plate and screws across the fracture site, trying to better secure it." (Tr. 16) Defendant was discharged on January 26, 2006, and he was again prescribed Percocet for any pain. (Tr. 16, 100)

About two weeks after that second surgery, defendant had a follow-up visit to the hospital and an x-ray revealed that the metal plate was starting to bend. (Tr. 16) On February 26, 2006, defendant returned to the emergency room complaining of pain in his right leg and Dr. Krugel subsequently performed an osteotomy on defendant. (Tr. 17-18) During that osteotomy, Dr. Krugel took the metal plate out, broke and aligned the bone, and put another plate in. (Tr. 18) On March 17, 2006, defendant was discharged from the hospital and prescribed Percocet for

any pain. (Tr. 21)[2] However, defendant was unable to obtain Percocet and, instead, he was given ten Vicodin pills as part of kit. (Tr. 105) Defendant returned to the hospital on March 18, 2006, and received a prescription for more Vicodin. (Tr. 105-106)

At the evidentiary hearing, Dr. Krugel testified that it is "uncommon" for a patient to have three separate surgeries of the type defendant had. (Tr. 19, 21) Dr. Krugel also testified that defendant's fracture was not healed at the time of his discharge from the hospital and that it usually takes about eighteen months for the type of fracture defendant suffered to heal. (Tr. 21) Dr. Krugel further testified that, given the nature of defendant's injury, defendant could have suffered intense pain if he was bumped on his right leg a month-and-a-half after his March 17, 2006 discharge. (Tr. 21-22)

Defendant testified at the evidentiary hearing that he experienced pain following his surgeries. (Tr. 101) Defendant described the pain he was experiencing as "a constant pain, because I might have pain shooting from my right leg to my left leg, maybe my head, and then some days all at one time, and I was weak and couldn't do nothing." (Tr. 110) Defendant also testified that he relied on a walker and a wheelchair to get around and that he wore a hard plastic leg brace at all times. (Tr. 108, 113) Defendant further testified that he was instructed not to put weight on his leg and that he regularly cleaned his wounds, which involved removing the brace, removing the bandages, draining the wounds, wiping his wounds with gauze, spraying the

---

[2] Defendant's Discharge Instruction Record, dated March 17, 2006, was entered as Exhibit 1 to Defendant's Motion to Suppress.

wounds with a gel, reapplying gauze, taping the gauze, and replacing the leg brace. (Tr. 102-103)

Both Dr. Krugel and defendant testified that the medical records from defendant's treatment fail to demonstrate any brain injury, or mental or cognitive deficits and that defendant has never complained of or been treated for short-term memory loss, drooling, confusion, slurred speech and narcolepsy. (Tr. 27-30, 136-138) Dr. Krugel also testified that he never observed defendant suffering from any such ailments, but they are sometimes side effects to the medication that defendant had been prescribed. (Tr. 30-32)

On April 8, 2006, Detroit Police officers and FBI agents executed a search warrant at defendant's home. (Tr. 42, 74) Detroit Police officer Carmen Diaz testified that she led the search. (Tr. 75) Diaz also testified that she advised defendant of his rights on that date and that, after he signed an advice of rights form,[3] she interviewed defendant. (Tr. 75-77) According to Diaz, she spoke with defendant for thirty minutes and defendant seemed normal. (Tr. 76) Diaz did not observe defendant slurring his speech or drooling. (Tr. 76) Diaz did testify that defendant "had a hard time walking with the walker, and . . . had a brace on his mid section" (Tr. 75-76) and that, although there was probable cause to arrest defendant at that time, she decided not to arrest him because the investigation was still ongoing and because defendant's "medical condition" and the procedures of the Detroit Police Department would have required that defendant be taken to a hospital, which was not feasible in the "raid van" the police were using.

---

[3] A Certificate of Notification signed by defendant and dated April 8, 2006, is attached as Exhibit F to the Government's Response to Defendant's Motion to Suppress Statements.

(Tr. 79, 81-82, 90)  FBI Special Agent Peter Lucas testified at the evidentiary hearing that he was present for that search, he observed defendant for around thirty minutes, and, while defendant had limited mobility, defendant did not appear to be in any pain.  (Tr. 43-44)

On April 12, 2006, Dr. Krugel examined defendant again.  (Tr. 29)  Dr. Krugel testified that, during the examination, defendant reported that he had minimal pain and that he was not taking any medication at that time.  (Tr. 29)  Dr. Krugel also testified that defendant had the ability to take prescription pain medication had he chosen to, but had ceased taking it based upon his own determination that his pain was minimal.  (Tr. 29)  Dr. Krugel further testified that any adverse side-effects that defendant might have incurred from the medication would have dissipated once he ceased taking that medication.  (Tr. 32)  Defendant testified at first that he was not in pain on April 12, 2006, "because I already took pain medication to get to the hospital . . .." (Tr. 109)  However, after defendant's attorney noted that the medical report "says that you weren't even taking pain medication on that day" (Tr. 109), defendant admitted that he was not taking any medication at that time.  (Tr. 109)

On April 13, 2006, defendant was arrested and interviewed by law enforcement officers. Defendant and law enforcement officers have conflicting versions of what happened on that day. Defendant testified that, on April 13, 2006, he awoke around 3:00 a.m. because of pain and that he then cleaned his wound and changed his brace.  (Tr. 109-110)  Defendant also testified that, as he was lying on the couch around 6:00 a.m., the FBI and police came in.  (Tr. 110-111) According to defendant, he was taken from his home and, while in the parking garage of the McNamara Building, his right leg slammed into a car and he was in great pain.  (Tr. 120)

Defendant testified that he immediately asked for pain medication, but his request was denied. (Tr. 121) Defendant also testified that he asked for pain medication again while in an elevator, but his request was denied for a second time. (Tr. 122) Defendant further testified that he asked for pain medication for a third time when he arrived in the interview room, and that his request was once again denied. (Tr. 123) According to defendant, Lucas told defendant that defendant was not going to get any medication until "after the fact" and Lucas only gave defendant a bagel. (Tr. 123) Defendant starting answering questions, but he asserts that he only did so because his pain was uncontrollable and he thought the only way he was going to get medication was to do so. (Tr. 123-124) Defendant also testified that, after the questioning was over, Lucas told him to sign an advice of rights form, which defendant did.[4] (Tr. 123, 127-128) Defendant further testified that Lucas gave defendant pain medication after the questioning was over. (Tr. 128)

Lucas testified that, on April 13, 2006, the law enforcement officers arrived at defendant's house at 6:44 a.m. (Tr. 45) Defendant was arrested and, according to Lucas, defendant did not appear to be in any pain and he did not ask for any medications. (Tr. 44, 47-48) Lucas also testified that they arrived at the FBI's office in the McNamara Building around 7:25 a.m. and that it took another twenty minutes to get defendant from the parking area to the interview room. (Tr. 48) Lucas furthered testified that he advised defendant of defendant's Miranda[5] rights prior to the beginning of the interview and that defendant signed a

---

[4]The signed Advice of Rights form is attached as Exhibit D to the Government's Response to Defendant's Motion to Suppress Statements.

[5]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

form acknowledging his rights. (Tr. 48-49) According to Lucas, defendant agreed to speak with Lucas and defendant did not complain of pain, request any pain medication, or appear to be in pain. (Tr. 49-50) Lucas also testified that the interview lasted approximately two hours and that, during the interview, defendant was offered and ate a bagel. (Tr. 50) Lucas further testified that defendant did not appear to be in any pain, had no trouble understanding questions, had no trouble answering any questions, had no memory problems, did not slur his speech, did not drool, and did not have any trouble staying awake. (Tr. 51-53) According to Lucas, defendant asked for and received water following the interview. (Tr. 50) Lucas also testified that, after they left the FBI's office and arrived at the federal courthouse around 10:15 a.m., defendant asked for and received a Vicodin. (Tr. 52-53) Lucas did not record the interview or seek permission to record the interview because he did not think it was warranted. (Tr. 63-64)

Diaz testified that she was present at the arrest defendant on April 13, 2006. (Tr. 77-78) According to Diaz, while Detroit Police procedures would have required that defendant be taken to a hospital after the arrest, the arrest was made by the FBI and the FBI had different procedures and policies. (Tr. 90) Diaz also testified that she was present for the interrogation of defendant and that, during the interview, defendant did not appear to be in any pain, did not slur his speech, did not drool, was not fighting off sleep and did not have any memory problems. (Tr. 78-79)

After the interview, defendant was transferred to the U.S. Marshal's Lockup at the Federal Courthouse and, later, to the Wayne County Jail. (Tr. 129-130) At the Wayne County Jail, a nurse named Renella Thomas saw defendant around 9:00 p.m. (Tr. 37-38, 40) According

to Thomas' records, defendant had both a wheelchair and walker with him, complained of pain, and did not have any medications.[6]  (Tr. 40)

### B. Procedural History

Defendant, along with four co-defendants, is charged in an Indictment with Conspiracy to Use Interstate Commerce Facilities in the Commission of Murder for Hire in violation of 18 U.S.C. § 1958 (D/E #1).

On July 18, 2008, defendant filed a Motion to Suppress Statements given by defendant at the FBI Detroit Field Office on April 13, 2006 (D/E #138).  In that motion, defendant argues that his statements should be suppressed because the agents failed to advise defendant of his rights under <u>Miranda</u> prior to questioning.  Defendant also argues that his statements should be suppressed because his statements were not voluntary given that law enforcement officers denied defendant access to pain medications until he talked to them.  Defendant further argues that, if the Court denies defendant's request to suppress all of his statements, the Court should still exclude all references to the drug and gun offenses of Cr. No. 07-20606, before Judge Edmunds because such other acts evidence would constitute improper character evidence and be unduly prejudicial to defendant.

On August 8, 2008, defendant filed a Supplemental Brief in Support of Motion to Suppress Statements (D/E #169).  In that supplemental brief, defendant primarily addresses the

---

[6] A Progress Report regarding defendant written by Thomas is Exhibit 2 to Defendant's Motion to Suppress Statements.

factual basis of defendant's motion in light of the transcript of an evidentiary hearing on the similar motion in Cr. No. 07-20606 before Judge Edmunds.

On November 18, 2008, the government filed a Response to Defendant's Motion to Suppress Statements (D/E #188). In that response, the government argues that the motion should be denied because defendant was advised of his Miranda rights and voluntarily gave a statement on April 13, 2006. The government also stipulated that it will not offer defendant's statements regarding the drug and gun case in its case-in-chief in the instant case and that, while the stipulation does not extend to the potential use of those statements for impeachment purposes where appropriate, the government would request permission from the Court if it seeks to use defendant's statements regarding the drug and gun case for impeachment purposes.

### III. Discussion

#### A. *Miranda* Warnings

Before the police may interrogate a suspect in custody, they must first read the Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); U.S. v. Pacheco-Lopez, 531 F.3d 420, 423-424 (6th Cir. 2008). An "interrogation" comprises "not only [ ] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Miranda warnings are not, however, required for questions "reasonably related to the police's administrative concerns," such as the defendant's name, address, height, weight, eye color, date of birth and current address. Pennsylvania v. Muniz, 496 U.S. 582, 601, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990);

United States v. Clark, 982 F.2d 965, 968 (6th Cir. 1993) ("ordinarily ... the routine gathering of biographical data for booking purposes should not constitute interrogation under Miranda "). Where, as here, a statement is obtained by custodial interrogation, the prosecution has the burden of showing the use of the procedural safeguards, including the burden of showing that an accused received the required warnings. U.S. v. Short, 790 F.2d 464, 467-468 (6th Cir. 1986).

In this case, defendant testified that he was not advised of his Miranda rights prior to being questioned and that he only signed an Advice of Rights form after the questioning was over. (Tr. 123, 127-128)  However, Lucas testified that the Miranda warnings were given prior to the beginning of the interview (Tr. 48-49) and that testimony is supported by the Advice of Rights form signed by defendant and which indicated it was signed at 7:51 a.m.  (Advice of Rights form, attached as Exhibit D to the Government's Response to Defendant's Motion to Suppress)  Lucas' testimony and the signed Advice of Rights form are also corroborated by the FBI transcriptions describing the events of April 13, 2006.  (FBI Transcriptions, attached as Exhibits B and C to the Government's Response to Defendant's Motion to Suppress)  In light of the testimony of Lucas and the evidence provided by the government, especially the Advice of Rights form signed by defendant and demonstrating that defendant was advised of his rights prior to being questioned, this Court finds that the government has met its burden of showing defendant received the required warnings and defendant's statements should not be suppressed on that basis.

**B. Waiver of *Miranda* Rights**

Defendant also argues that any statements he gave were coerced and involuntary because law enforcement officers denied defendant access to pain medications until after he talked to them. A defendant may waive his or her Miranda rights, but the waiver must be voluntary, knowing, and intelligent, based on the totality of the circumstances. Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The government has the burden of proving by a preponderance of the evidence that the waiver was voluntary; however, in order for the waiver to be involuntary, there must be "an element of police coercion." Seymour v. Walker, 224 F.3d 542, 554 (6th Cir.2000) (citing Colorado v. Connelly, 479 U.S. 157, 169-71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421 (quoting Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).

In this case, the totality of the circumstances surrounding the interrogation reveals that defendant voluntarily waived his rights and gave a statement to the FBI. While defendant testified that he was only answered Lucas' questions because he needed pain medication and Lucas would only give him the pain medication if he answered the questions (Tr. 123-124), both Lucas and Diaz testified that defendant never asked for any pain medication and that defendant did not appear to be in any pain (Tr. 49-50, 78-79). Specifically, Lucas testified that defendant did not appear to be in any pain, had no trouble understanding questions, had no trouble answering any questions, had no memory problems, did not slur his speech, did not drool, and

did not have any trouble staying awake. (Tr. 51-53) Diaz specifically testified that she was present for the interrogation of defendant and that, during the interview, defendant did not appear to be in any pain, did not slur his speech, did not drool, was not fighting off sleep and did not have any memory problems. (Tr. 78-79)

The law enforcement officers' testimony regarding defendant's lack of pain is corroborated by Dr. Krugel's testimony and defendant's medical reports. As demonstrated by that evidence, on the day before defendant was interrogated, he only had minimal pain and he had, by his choice, ceased taking medication due to the lack of pain. (Tr. 29) Similarly, Dr. Krugel does not remember any drooling, slurring of words, memory loss, narcolespsy or confusion by defendant. (Tr. 27-30)

Moreover, defendant's testimony regarding the medical examination that took place the day before his arrest weakens defendant's credibility. Defendant first testified that he was not in pain on April 12, 2006, "because I already took pain medication to get to the hospital" and it was only after his attorney noted what the medical report said that defendant admitted that he was not taking any medication at that time. (Tr. 109) Defendant was thirty-six years old at the time of the April 13, 2006 interview and he considers himself to be an intelligent man, to the point where he researched for and helped conceptualize a motion to dismiss in the case before Judge Edmunds. (Tr. 96, 131-133) Furthermore, as noted by the government, defendant's allegations of uncontrollable pain appear to conflict with his very detailed testimony regarding the events of April 13, 2006.

In light of the above evidence and the totality of the circumstances surrounding the interrogation of defendant, this Court finds that defendant's statements were voluntary and that his statements should not be suppressed.

### C. Other Acts Evidence

Defendant also argues that, if the Court denies defendant's request to suppress all of his statements, the Court should still exclude all references to the drug and gun offenses of Cr. No. 07-20606, before Judge Edmunds.  In response, the government stipulated that it will not offer defendant's statements regarding the drug and gun case in its case-in-chief in the instant case and that, while the stipulation does not extend to the potential use of those statements for impeachment purposes where appropriate, the government would request permission from the Court if it seeks to use defendant's statements regarding the drug and gun case for impeachment purposes.  Given that response, this Court finds that defendant's motion is moot to the extent he requests suppression of other acts evidence.

### IV.  Conclusion

For the reasons discussed above, this Court recommends that defendant's motion be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  Thomas v. Arn, 474 U.S. 140 (1985); Howard v. Secretary of HHS, 932 F.2d 505, 508 (6th Cir. 1991); United States v.

Walters, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991); Smith v. Detroit Fed'n of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court.  The response shall address each issue contained within the objections specifically and in the same order raised.

                                        s/Virginia M. Morgan
                                        Virginia M. Morgan
                                        United States Magistrate Judge

Dated: February 18, 2009

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record via the Court's ECF System and/or U. S. Mail on February 18, 2009.

                                        s/Jane Johnson
                                        Case Manager to
                                        Magistrate Judge Virginia M. Morgan