UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

        **Plaintiff(s),**          **CASE NUMBER: 06-20185**
                                      **HONORABLE VICTORIA A. ROBERTS**

**v.**

**ROY CHRISTOPHER WEST,
MARCUS LAMONT FREEMAN,
MICHAEL ELDREN BRACEY,
ALVINO DEWIGHT CORNELIUS,
ALSEDDRICK DEWUNN WEST,**

        **Defendant(s).**
_____/

**ORDER AND NOTICE OF HEARING ON MOTION**

**I.    BACKGROUND AND PROCEDURAL HISTORY**

    **A.    Leonard Day's Statements**

At approximately 6:30 p.m. on December 20, 2005, Officers Aaron Colwell and Kenneth Bresinski of the Detroit Police Department responded to a shooting on 14759 Kilbourne. On arrival, the officers saw Leonard Day sitting motionless in the driver's seat of a blue 1999 Chevy Tahoe. He had been shot. There were numerous bullet holes along the driver's side and rear of the Tahoe. Medical personnel removed Day from the Tahoe and placed him in an ambulance.

        **1.    Police Report Dated December 20, 2005 at 7:24 p.m.**

In a police report written by Officer Tracey Weinert on December 20, 2005 at 7:24 p.m., Officer Weinert indicated that Day told officers at the scene that the shooter "could have been" a black male he has been feuding with named Roy West who lives in

1

Akron, Ohio.

## 2. Police Report Dated December 20, 2005 at 11:40 p.m.

In a police report dated December 20, 2005 at 11:40 p.m., Officer Bresinski indicated that he spoke with Day in the ambulance. According to Officer Bresinski, Day said his name was Eric Smith, and his date of birth was "1 - 4 then stated 31." Officer Bresinski then outlines the exchange he had with Day in the ambulance:

OFFICER BRESINSKI: what kind of vehicle was at the scene?

DAY: gray . . . blue . . . black Bonneville 4 door.

OFFICER BRESINSKI: who shot you?

DAY: Roy.

OFFICER BRESINSKI: who shot you?

DAY: Roy.

OFFICER BRESINSKI: Roy shot you?

DAY: Yes.

OFFICER BRESINSKI: what is Roy's last name?

DAY: West.

OFFICER BRESINSKI: can you repeat it?

DAY: Roy West.

OFFICER BRESINSKI: Roy West shot you?

DAY: yes (and nodding his head affirmatively).

OFFICER BRESINSKI: what happened?

DAY: my necklace was taken in a robbery.

OFFICER BRESINSKI: what is Roy West's height and weight?

DAY: he is my size.

OFFICER BRESINSKI: he is around your height?

DAY: yes.

OFFICER BRESINSKI: how tall are you?

DAY: 5'9".

OFFICER BRESINSKI: is he also around your weight?

DAY: yes.

OFFICER BRESINSKI: how much do you weigh?

DAY: about 200.

OFFICER BRESINSKI: how old is Roy West?

DAY: late 20's . . . early 30's.

OFFICER BRESINSKI: is Roy light, medium, or dark complexion?

DAY: dark.

OFFICER BRESINSKI: where does Roy live? (this question was asked 2-3 times before Day answered)

DAY: Ohio. Akron, Ohio . . . Marytreat Apartments 10 . . . Monroe . . . 10.

Officer Bresinski asked for clarification.

DAY: Apartment 10 on Monroe Street.

     Officer Bresinski said Day appeared to do the best he could through his pain and agony. Officer Bresinski could not obtain further information once the ambulance arrived at St. John Hospital; Day was declared in critical condition. He was pronounced dead on December 21, 2005 at 12:50 a.m. He survived approximately seven hours after the shooting.

B.    **Procedural History**

Before the Court is Roy's "Motion to Preclude the Introduction of any Statements of Leonard Day After he was Shot on December 20, 2005." (Doc. #253). Roy seeks an order prohibiting the Government and his co-Defendants from introducing into evidence the statements Day made after he was shot on December 20, 2005. His primary argument is that to allow the statements in as evidence would violate his Sixth Amendment right to confront witnesses, since Day's statements are testimonial in nature. *See Crawford v. Washington*, 541 U.S. 36 (2004).

Oral argument was heard on June 19, 2009.

At the hearing, the Government as well as co-Defendants Michael Eldren Bracey, Alvino Dewight Cornelius, and Alseddrick Dewunn West stipulated to the relief requested. Therefore, Roy's motion is **GRANTED** as to Roy, Bracey, Cornelius, and Alseddrick.

Co-Defendant Marcus Lamont Freeman seeks to introduce Day's statements at trial. Freeman wants to use Day's statements as exculpatory evidence in his favor and relies on his Fifth and Sixth Amendment rights to offer evidence in support of his defense. He also relies on the Federal Rules of Evidence (dying declaration under Fed. R. Evid. 804(b)(2) and excited utterance under Fed. R. Evid. 803(2)).

The Government stated at the hearing that it does not believe Day's statements qualify as a dying declaration. Nevertheless, it agrees to participate in an evidentiary hearing to determine if Freeman can lay the proper foundation for the introduction of Day's statements as a dying declaration.

On July 2, 2009, the Government submitted a "Supplemental Reply to Defendant Marcus Freeman's Response to Defendant Roy West's Motion to Preclude the Introduction of any Statements of Leonard Day After he was Shot on December 20, 2005." (Doc. #321).  The Government says it does not believe Day's statements qualify as excited utterances because they were not made under circumstances that eliminate the possibility of fabrication.

For the following reasons, Roy's motion is **DENIED** as to Freeman; with the proper foundation laid, Day's statements may be admissible in Freeman's defense.

## II. ARGUMENTS AND ANALYSIS

It is important to distinguish between the authorities relied on by the various Defendants in support of their arguments to either exclude (Roy) or allow (Freeman) Day's statements at trial.

Roy seeks to exclude the statements based on his Sixth Amendment right to confront and cross-examine witnesses against him.  Freeman seeks to allow the statements based on his Fifth and Sixth Amendment rights to present a defense, and relies also on the Federal Rules of Evidence.

Because the Government agrees not to introduce Day's statements at Roy's trial, the only issue before the Court is whether Day's statements are admissible at Freeman's trial.

### A.    Freeman's Fifth and Sixth Amendment Right to Present a Defense

Defendants undoubtedly have a fundamental and constitutional right to a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S.

683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

The Compulsory Process Clause of the Sixth Amendment grants Defendants the right to offer the testimony of favorable witnesses and to compel their trial testimony. *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . have compulsory process for obtaining witnesses in his favor[.]").

Freeman relies on that right as well as *Chambers v. Mississippi*, 410 U.S. 284 (1973), where the Supreme Court held that the defendant was denied a fair trial because the state's hearsay rules prevented him from calling witnesses at trial who offered reliable, exculpatory evidence. *See Chambers*, 410 U.S. at 302 ("where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."). However, the evidence offered must be material, not cumulative, reliable and trustworthy. *See Chambers*, 410 U.S. at 300-02.

Accordingly, the Court examines Day's statements to determine if they qualify as a hearsay exception under the Federal Rules of Evidence, and if they are otherwise reliable and trustworthy.

**B. Dying Declaration**

Fed. R. Evid. 804(b)(2) says:

In a prosecution for homicide . . ., a statement made by a declarant while believing that the declarant's death was imminent, concerning the case or circumstances of what the declarant believed to be impending death [is not excluded by the hearsay rule].

Dying declarations were declared admissible in *Mattox v. United States*, 156 U.S. 237 (1895) because "the sense of impending death [was] presumed to remove all

6

temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath." *Fulcher v. Motley*, 444 F.3d 791, 800 (6th Cir. 2006) (quoting *Mattox*, 156 U.S. at 244).

Dying declarations are inadmissible if they are based on suspicion or conjecture. *See United States v. Etheridge*, 424 F.2d 951, 966 (6th Cir. 1970) ("[t]he declaration is kept out if the setting of the occasion satisfies the judge, or in reason ought to satisfy [her], that the speaker is giving expression to suspicion or conjecture, and not to known facts") (citing *Shepard v. United States*, 290 U.S. 96, 101 (1933)).

The Supreme Court emphasized that a dying declaration must be made not in contemplation of possible or even likely death, but in the face of imminent and apparently certain death; that is, the statement must be made in the "shadow of impending death." *Shepard v. United States*, 290 U.S. 96, 99 (1933).

Roy says Day's statements should be excluded from evidence because he (Roy) could not have been the shooter since he was in Ohio at the time. In addition, Roy says Day lied about the robbery and provided a false name and date of birth. According to Roy, the false information makes Day's statements unreliable.

Both Roy and the Government say Day provided a false name because he did not want to be arrested for the attempted murder case in which he was a suspect and because he was an absconder from parole (i.e., Day believed he would recover and be arrested).

Further, Roy says there is a possibility that Day's identification of him as the shooter was based on suspicion and conjecture. The Government agrees with this possibility and adds in a footnote that Officer Weinert's police report says Day indicated

7

Roy "could have been" the shooter.

In the same footnote, the Government argues that at least one witness reported that there were two shooters. According to the Government, Day's identification of Roy as one of the shooters, even if reliable, would not exculpate Freeman.

Fed. R. Evid. 804(b)(2) requires the Court to determine whether Day's statements: (1) were made while Day believed his death was imminent; and (2) concerned the case or circumstances of his death. Rule 804(b)(2) does not have a "truth" requirement.

Based on the number of bullet holes in the Tahoe, the fact that Day was motionless in the Tahoe, Officer Bresinski's statement that Day was in pain and agony, and the fact that Day was in critical condition when he arrived at the hospital, Freeman may be able to show Day believed his death was imminent.

Day's statements concerned the circumstances of his death; Day said Roy shot him.

It does not appear that Day's statements were based on suspicion and conjecture. A witness told Officer Colwell that Day was robbed at a club a week before the shooting. Day may have had reason to believe Roy was responsible for the robbery and the shooting. In addition, while Officer Weinert stated in a police report that Day said Roy "could have been" the shooter, Officer Bresinski spoke with Day shortly after the shooting. Officer Bresinski's report says Day definitely identified Roy as the shooter.

Further, the fact that a witness said Day was shot by two people does not make Day's statements inadmissible.

Day's statements may be admissible as a dying declaration under Fed. R. Evid. 804(b)(2). If they are declared such after a proper foundation is laid, they may be contradicted in the same manner as other testimony. *See Carver v. United States*, 164 U.S. 694, 697 (1897). The jury will decide the weight and credibility to apply to the dying declaration.

The Court will hold an evidentiary hearing before trial to determine whether Freeman can lay the proper foundation to establish that Day's statements were made under a sense of impending death. This may be shown by what Day said; by evidence concerning the nature and extent of Day's wounds as suggesting Day must have felt or known that he could not survive; or, from Day's conduct at the time and the communications, if any, that were made to him by his medical advisers, if assented to or understandingly acquiesced in by him. *See Mattox*, 146 U.S. at 151.

It should be noted that *Carver* says dying declarations may be discredited by proof that the character of the deceased was bad. *See Carver*, 164 U.S. at 697. At least two courts follow this rule when the evidence is introduced for impeachment purposes. *See State v. Quintana*, 98 N.M. 17 (1982) (a defendant can impeach the dying declaration by showing the deceased had a bad reputation for truthfulness); *Johnson v. State*, 169 Ga. 814 (1930) (accused may impeach dying declaration by showing that the deceased was unworthy of belief because of general bad character).

However, the *Carver* rule is immaterial because the Government is not seeking to introduce Day's bad character to impeach the dying declaration. Indeed, the Government wants Day's bad character excluded from evidence.

**C.    Excited Utterance**

Freeman argues that Day's statements are admissible as an excited utterance.

Fed. R. Evid. 803(2) says:

> A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition [is not excluded by the hearsay rule].

The rationale behind the admissibility of excited utterances is that the statement is reliable because it was made while the declarant was under the stress of excitement. *Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983).

The Court applies three factors to determine whether Day's statements qualify as excited utterances:

> First, there must be an event startling enough to cause nervous excitement. Second, the statement must be made before there is time to contrive or misrepresent. And, third, the statement must be made while the person is under the stress of the excitement caused by the event.

*Id.* In sum, the statements must have been given:

> under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.

*Idaho v. Wright*, 497 U.S. 805, 820 (1990) (citations omitted).

The Government does not dispute the first or third factors. It relies on *United States v. Winters*, 33 F.3d 720 (6th Cir. 1994) to support its argument that Day's statements are inadmissible as excited utterances because they were fabricated (i.e., Day had time to contrive or misrepresent).

10

In *Winters*, the victim named a number of individuals as his likely assailants two days after the shooting. In addition, the victim changed his story on more than one occasion. *Winters*, 33 F.3d at 722-23. Nevertheless, defendants claimed the victim's statements were admissible as excited utterances. *Id.* at 722.

The Sixth Circuit agreed with the district court's finding that the statements "were the product of conscious reflection" and were not made under the stress and excitement caused by the shooting. *Id.* at 723. The Court said the statements were essentially the victim's speculation about who might have wanted to hurt him and did not carry any indicia of reliability. *Id.* at 722-23.

The Government says Day's statements are similar to the victim's statements in *Winters* in that they do not carry any indicia of reliability. According to the Government, Day lied about his identity; told Officer Weinert that unknown perpetrator(s) approached him and fired several shots; speculated that the shooting was in furtherance of a robbery because there is no evidence connecting Roy to the robbery; and initially said Roy "could have been" the shooter, but changed his story to Roy definitely shot him.

Further, the Government says the Grand Jury found probable cause to believe Freeman was looking for Day on Kilbourne days before the shooting, Freeman called Roy after the shooting to report that "the situation is over with," and Freeman and a cohort traveled to Ohio to receive payment from Roy after the murder.

In determining whether Day made the statements before there was time to "contrive or misrepresent," the Court focuses on whether he had the opportunity to do so in light of the circumstances of the event. *See Maggard v. Ford Motor Co.*, 2009 WL

11

928604 at *4 (6th Cir. April 7, 2009) (citations omitted).  In addition, while there is no bright-line rule as to the amount of time that must elapse before a statement is taken out of the realm of an excited utterance, See United States v. Scott, 2003 WL 21659444 at **3 (6th Cir. July 10, 2003) (citing Haggins, 715 F.2d at 1057), one of the most relevant factors in determining spontaneity is the length of time between the event and the statement.  Haggins, 715 F.2d at 1057.  "Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in reflective thought process."  Id. at 1058 (quoting McCormick's Handbook of the Law of Evidence § 297 at 705-706 (2d ed. 1972)).

Day was shot at approximately 6:00 p.m. on December 20, 2005, and Officer Weinert wrote a police report at 7:24 p.m. that described what occurred between Day and other officers at the scene.  Therefore, Day made the statements within two hours of being shot.  In addition, there is evidence that Day was still suffering from the effects of the shooting when he made the statements; Day was motionless when officers arrived, and Officer Bresinski indicated that he was in pain and agony.

Based on these circumstances, it is unlikely that Day had the time or was in a position to fabricate his statements or engage in reflective thought after he was shot.  See id. ("[p]hysical factors such as . . . pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum") (citing 4 J. Weinstein & M. Berger Weinstein's Evidence ¶ 803(2)[01] at 803-85 (1981)).

12

Even if Day's statements were fabricated, they are not necessarily inadmissible. *See United States v. Hadley,* 431 F.3d 484, 498 (6th Cir. 2005) ("a statement that satisfies all of the elements of our test for excited utterances meets the threshold for admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as . . . the speaker's motive to fabricate") (citing *United States v. Schreane*, 331 F.3d 548, 563 (6th Cir. 2003)).

If Day's statements satisfy the three factors of the excited utterance test, "[a]ny challenges to the reliability of [his] statements would go to . . . weight rather than . . . admissibility[.]". *Id.*

Notably, unlike the victim in *Winters*, Day did not change his story. He named Roy as the perpetrator according to Officer Weinert and Officer Bresinski. In addition, the police report does not say Day told Officer Weinert that one or more unknown perpetrators approached him as the Government claims. It says "once [Day] was seated in his vehicle an unk perp(s) approached and fired several shots[.]". The source of that information is unknown.

### III.     CONCLUSION

Roy's motion is **GRANTED IN PART AND DENIED IN PART**. Day's statements are inadmissible against Roy, Bracey, Cornelius, and Alseddrick based on their stipulation.

Day's statements are admissible in favor of Freeman pursuant to Fed. R. Evid. 804(b)(2), if he lays the proper foundation to establish that Day made the statements under the belief of impending death.

They are also admissible under Fed. R. Evid. 803(2), if Freeman lays the proper foundation to establish that Day's statement that Roy shot him in furtherance of the robbery is trustworthy (i.e., he can present admissible evidence that connects Roy to the robbery at the club).

The Court will hold an evidentiary hearing on **September 22, 2009 at 9:00** to determine if Day's statements qualify as either a dying declaration or an excited utterance. The Government will make its objection, and the Court will make a ruling.

**IT IS ORDERED**.

                                                      s/Victoria A. Roberts  
                                                      Victoria A. Roberts  
                                                      United States District Judge

Dated: July 8, 2009

---

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on July 8, 2009.

s/Linda Vertriest  
Deputy Clerk

---