**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

                  **Plaintiff(s),**           **CASE NUMBER: 06-20185**
                                             **HONORABLE VICTORIA A. ROBERTS**

**v.**

**ROY CHRISTOPHER WEST,**
**MARCUS LAMONT FREEMAN,**
**MICHAEL ELDREN BRACEY, and**
**ALSEDDRICK DEWUNN WEST,**

                  **Defendant(s).**

_____/

**ORDER DENYING IN PART DEFENDANTS'**
**MOTION TO SUPPRESS WIRETAP EVIDENCE**

**I.      INTRODUCTION**

      This matter is before the Court on Michael Eldren Bracey's "Motion to Suppress

Wire Tap Evidence" (Alseddrick Dewunn West, Roy Christopher West, and Marcus

Lamont Freeman join) (Doc. #165).  Bracey asks the Court to suppress all of the wiretap

evidence obtained pursuant to the Order issued on September 28, 2005 and the two

extension orders entered on October 31, 2005 and November 3, 2005.

      Oral argument was heard on June 19, 2009.  On June 26, 2009, the Court

entered an Amended Order that gave Defendants until July 8, 2009 to supplement their

wiretap motion, if they believed additional information would assist the Court in its

decision.  Defendants did not supplement.

      For the following reasons, Defendants' motion is **DENIED IN PART**.  The Court:

(1)     Denies Defendants' motion based on their argument that the Government failed

1

to meet the necessity requirement before seeking a wiretap; and

(2)     Holds in abeyance Defendants' argument that the Government violated its duty to minimize the wiretap interception.  The Court will rule on this argument after an evidentiary hearing.

## II.      BACKGROUND AND PROCEDURAL HISTORY

### A.      September 28, 2005 Wiretap Application, Affidavit, and Order

On September 28, 2005, an Assistant United States Attorney ("AUSA") for the

Eastern District of Michigan, submitted an Application for an Order Authorizing the

Interception of Wire Communications To and From Cellular Telephone Number 313-

304-7959 with PUSH TO TALK number 130*116*6786.  The Application was supported

by an Affidavit from Special Agent Peter B. Lucas ("SA Lucas") of the Federal Bureau of

Investigation in Detroit, Michigan.

The AUSA sought:

> authorization to intercept wire communications of MICHAEL ELDREN
> BRACEY . . . and others as yet unknown concerning offenses . . .
> involving the unlawful procurement, importation, concealment,
> transportation, distribution and sale of controlled substances, in violation
> of [21 U.S.C. §841(a)(1)]; Illegal Distribution of Controlled Substances; [21
> U.S.C. §843(b)]; Unlawful Use of a Communication Facility; and [21
> U.S.C. §846]; Conspiracy to Distribute Controlled Substances.

An Order Authorizing the Interception of Wire Communications was signed by a

United States District Judge for the Eastern District of Michigan on September 28, 2005.

### B.      Two Extension Orders

#### 1.      October 31, 2005 Extension Application, Affidavit, and Order

On October 31, 2005, the AUSA submitted an Application for an extension of the

September 28, 2005 Order. The Application was supported by an Affidavit from SA

Lucas. SA Lucas's Affidavit incorporates by reference his Affidavit dated September 28,

2005.

The AUSA sought:

> authorization to intercept wire communications of MICHAEL ELDREN
> BRACEY, . . . ALVINO DEWIGHT CORNELIUS, ROY CHRISTOPHER
> WEST, . . . and others as yet unknown concerning offenses . . . involving
> the unlawful procurement, importation, concealment, transportation,
> distribution and sale of controlled substances, in violation of [21 U.S.C.
> §841(a)(1)]; Illegal Distribution of Controlled Substances; [21 U.S.C.
> §843(b)]; Unlawful Use of a Communication Facility; and [21 U.S.C. §846];
> Conspiracy to Distribute Controlled Substances.

An Order Authorizing the extension was signed by a United States District Judge

for the Eastern District of Michigan on October 31, 2005.

### 2.   November 3, 2005 Extension Order

Defendants say another extension Order was entered on November 3, 2005.

That document was not provided to the Court.

### C.   Procedural History

While the AUSA sought the wiretap as part of alleged drug crimes, the agents

intercepted conversations about a murder-for-hire scheme.

On April 6, 2006, Defendants were indicted for Conspiracy to Use Interstate

Commerce Facilities in the Commission of Murder-for-Hire, in violation of 18 U.S.C.

§1958.

Defendants filed the motion to suppress wiretap evidence on August 1, 2008.

### III.   BRIEF OVERVIEW OF TITLE III OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), 18 U.S.C. §2510 *et seq.*, after the Supreme Court's decisions in *Berger v. New York*, 388 U.S. 41 (1967) (New York's statute that allowed a judge to issue an *ex parte* order for eavesdropping violates the Fourth and Fourteenth Amendments) and *Katz v. United States*, 389 U.S. 347 (1967) (electronically recording words spoken into a telephone receiver in a public telephone booth constituted a search and seizure under the Fourth Amendment and does not comply with constitutional standards without prior judicial sanctions and attendant safeguards). *See Scott v. United States*, 436 U.S. 128, 130 (1978).

The purpose of Title III is to regulate and control warrants for wiretaps. *United States v. Alfano*, 838 F.2d 158, 161 (6th Cir. 1988). It creates limited authority for electronic surveillance in the investigation of specified crimes thought to lie within the province of organized criminal activity. *United States v. Kalustian*, 529 F.2d 585, 588 (9th Cir. 1975) (citing S. Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2153). Under Title III, the Federal Government can conduct electronic surveillance, if it obtains judicial authority to do so and conducts the surveillance under carefully defined circumstances. *Id.* "Procedural steps provided in [Title III] require strict adherence." *Id.* (citing *United States v. Giordano*, 416 U.S. 505 (1974)).

> Within our prescribed limits, . . . the utmost scrutiny must be exercised to determine whether wiretap orders conform to Title III. [Title III] has been declared constitutional only because of its precise requirements and its provisions for close judicial scrutiny.

*Id.* at 589 (citations omitted); *see also Alfano*, 838 F.2d at 161 ("The basic standards for

4

a wiretap are similar to those for a search warrant, but there also must be strict compliance with Title III") (citations omitted).

Defendants argue that the Government violated 18 U.S.C. §§ 2518(1)(c) (necessity requirement) and 2518(5) (duty to minimize).

The Court first addresses the argument raised by Defendants that the Government failed to meet the necessity requirement before seeking a wiretap.

## IV.   NECESSITY REQUIREMENT OUTLINED IN 18 U.S.C. §2518(1)(c)

### A.   Government's Duty to Show a Wiretap is Necessary

"Generally, the government must overcome the statutory presumption against granting a wiretap application by showing necessity."  *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (citing *United States v. Giordano*, 416 U.S. 505, 515 (1974); *United States v. Bailey*, 607 F.2d 237, 241 n.11 (9th Cir. 1979)); *see also* 18 U.S.C. §2518(1)(c):

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter . . . shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous[.]

The necessity requirement serves three purposes.  First, it limits the use of wiretaps, which are highly intrusive.  *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001) (citations omitted).  Second, it ensures a wiretap "is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).  Third, "the necessity requirement protects against the impermissible use of a wiretap as

5

the 'initial step in [a] criminal investigation.'" *United States v. Rice*, 478 F.3d 704, 710

(6th Cir. 2007) (quoting *United States v. Giordano*, 416 U.S. 505, 515 (1974)); *see also*

*Kalustian*, 529 F.2d at 589-90:

> Congress legislated in considerable detail in providing for applications and
> orders authorizing wiretapping and evinced the clear intent to make doubly
> sure that the statutory authority be used with restraint and only where the
> circumstances warrant the surreptitious interception of wire and oral
> communications.  These procedures were not to be routinely employed as
> the initial step in criminal investigation.

(Quoting *United States v. Giordano*, 416 U.S. 505 (1974)).

The Government is not required to prove that it tried every other conceivable

method and failed; that it exhausted all avenues of investigation; or, that all other means

were absolutely impossible.  *Alfano*, 838 F.2d at 163-64.  "All that is required is that the

investigators give serious consideration to the non-wiretap techniques prior to applying

for wiretap authority and that the court be informed of the reasons for the investigators'

belief that such non-wiretap techniques have been or will likely be inadequate."  *United*

*States v. Lambert*, 771 F.2d 83, 91 (6th Cir. 1985) (citing *United States v. Alonso*, 740

F.2d 862, 868 (11th Cir. 1984); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.

1984)).

A purely conclusory affidavit that does not contain information about the

particular facts of the case is inadequate because it does not provide facts from which a

detached judge or magistrate can determine whether alternative investigative

procedures exist as a viable alternative.  *See Kalustian*, 529 F.2d at 590.  The

application must be denied if the Government does not allege specific circumstances

that render traditional investigative techniques ineffective.  *Ippolito*, 774 F.2d at 1486

6

(citing *United States v. Abascal*, 564 F.2d 821, 825-86 (9th Cir. 1977); *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir. 1975)); *see also United States v. Robinson*, 698 F.2d 448, 453 (D.C.Cir. 1983):

> we must be careful not to permit the government merely to characterize a case as a "drug conspiracy" . . . that is therefore inherently difficult to investigate.  The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail.

(Emphasis in original) (citations omitted).

In determining whether SA Lucas's Affidavits meet the necessity requirement, the Court views the information "in a practical and common sense fashion."  *United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir. 1977) (citing S.Rep. No. 1097, 1968 U.S.Code Cong. & Ad.News, p. 2190); *see also Kalustian*, 529 F.2d at 589:

> [w]here [the underlying circumstances in the affidavit] are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense[sic], manner.

(Quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).  The Court also considers the fact "[that] wiretapping is particularly appropriate when the telephone is routinely relied on to conduct the criminal enterprise under investigation."  *Landmesser*, 553 F.2d at 20 (quoting *United States v. Steinberg*, 525 F.2d 1126, 1130 (2nd Cir. 1975)).

If the necessity requirement is not met, the Court must suppress any evidence obtained through SA Lucas's Affidavits.  *See Rice*, 478 F.3d at 710.

### B.   Confidential Sources

During this investigation, SA Lucas received information from two confidential

7

sources:

(1)     Bracey distributes cocaine, marijuana, and heroin in the Detroit area;

(2)     Bracey's address, the type of cars Bracey drives, the license plate numbers of the cars, whom the cars are registered to (i.e., the lessee), and the address for the lessee;

(3)     The name of the individual Bracey purchased one-half kilogram of cocaine from for $10,500.00 - $11,000.00, where that individual lives, and what type of car that individual drives;

(4)     The name of the individual Bracey purchased marijuana from in early 2005 with Source One present, and where the transaction occurred;

(5)     The name of the individual Bracey purchased nine ounces of cocaine and one pound of marijuana from in April 2005, and where the transaction occurred;

(6)     The address Bracey and another individual use for their drug trafficking enterprise;

(7)     A "white boy" purchases cocaine and heroin from Bracey in the area of Gratiot Avenue and Mt. Elliott Street; and

(8)     Source Two knows an individual involved in the distribution of cocaine and marijuana in the Detroit metropolitan area.

Source One consented to the recording of telephone calls to Bracey to purchase cocaine; he wore a recording device during controlled drug purchases.

Both Source One and Source Two received monetary compensation for the information they provided.

With the information SA Lucas had about Bracey's alleged drug operation, he believed a wiretap was necessary to identify the full scope of the drug distribution enterprise and to prosecute all culpable participants. His Affidavit also addressed the traditional investigative techniques.

**C.     Traditional Investigative Techniques Tried and Failed**

8

SA Lucas said he tried three traditional investigative techniques that failed to ensure the successful prosecution of all individuals involved in illegal activity: (1) confidential sources (including controlled drug purchases); (2) pen register data and toll records; and (3) physical surveillance.

### 1.    Confidential Sources

According to SA Lucas, investigators benefitted from the information they obtained from two confidential sources.  Indeed, cooperation by Source One resulted in two controlled purchases of cocaine from Bracey, and verified the existence of the targeted drug distribution organization as well as Bracey's involvement in the organization.  Cooperation by Source Two verified that: (1) Bracey was in contact with individuals who were involved in the drug trafficking community; and (2) another individual was involved in drug trafficking activities.

Nonetheless, SA Lucas said: (1) the information did not facilitate the prosecution of all participants in the conspiracy; (2) the confidential sources were unwilling to testify because they believed their lives and the lives of their families would be in jeopardy if it became known that they cooperated with law enforcement; (3) the information had not revealed the supply apparatus of the organization; and (4) the confidential sources were unable to provide more than identifying and historical information about individuals who appeared to be involved in illegal activity with Bracey.

In sum, SA Lucas said, "although the information provided by the sources in this investigation has been relevant and valuable, it is not enough, in and of itself, to enable the dismantlement of the organization and the prosecution of all participants."

### 2.    Pen Register Data and Toll Records

9

SA Lucas said a review of the pen register data and toll records showed the subjects of the investigation communicated through the target telephone.  Indeed, there were over 850 telephone contacts between the target telephone and co-conspirators between March 1, 2005 and September 19, 2005.

However, SA Lucas said that while pen register data and toll records provided investigative leads, they did not provide: (1) information about the content or text of the conversations; (2) direct evidence of criminal activity; or (3) the identities of the participants in the conversations.

### 3.    Physical Surveillance

SA Lucas said physical surveillance confirmed Bracey's participation in drug trafficking activity.  Specifically, on June 21, 2005, SA Lucas conducted a "drive by" of a house in Detroit, Michigan that he believed was connected to drug trafficking activity.  SA Lucas observed Bracey in the front passenger seat of a car parked next to the house.  In addition, SA Lucas said that on October 10, 2005, agents saw Bracey at a location believed to be connected to the drug distribution organization.

Nonetheless, SA Lucas said physical surveillance did not satisfy the objectives of the investigation because the subjects were surveillance-conscious.  For example, SA Lucas says that during surveillance of Bracey and Alvino Dewight Cornelius, they traveled at a high rate of speed and/or made quick turns without signaling.  SA Lucas believed Bracey and Cornelius drove in that manner to determine if they were being followed by law enforcement.  SA Lucas said such driving techniques made it extremely difficult and dangerous for law enforcement personnel to maintain surveillance.

Further, SA Lucas said: (1) Bracey used at least two addresses for drug

10

trafficking in disparate areas of Detroit, which made surveillance cumbersome; (2) the subjects of the investigation lived in and frequented densely populated communities, which made it difficult to conduct surveillance effectively; (3) additional surveillance would not have produced the evidence necessary to bring this case to prosecution; (4) additional surveillance would have undermined the investigation; and (5) conducting additional and more extensive surveillance would have made Bracey and his associates aware of the investigation. SA Lucas believed that if surveillance was detected by the subjects, they would not have discussed criminal activity on the target telephone.

Moreover, SA Lucas said telephone intercepts indicated that individuals were on the lookout for law enforcement personnel. SA Lucas said that on October 18, 2005, an individual told Bracey that he saw what he believed to be a "narco" (an undercover narcotics officer) in the area, and Bracey said he was not going to work that day. SA Lucas believed "work" was a euphemism for the distribution of illegal drugs.

### D.  Traditional Techniques Which Reasonably Appeared Unlikely to Succeed if Tried or Were Too Dangerous to Try

SA Lucas said the following traditional investigative techniques reasonably appeared unlikely to succeed if tried or were too dangerous to try: (1) search warrants; (2) undercover agents; (3) interviews; (4) a Grand Jury investigation; and (5) "trash pulls."

#### 1.    Search Warrants

While SA Lucas believed cocaine was kept at Bracey's house, another individual's house in Detroit, Bracey's "sister's" house, and in Bracey's car when he traveled, SA Lucas did not believe search warrants were useful for several reasons.

11

First, SA Lucas said he did not know where Bracey's "sister's" house was located.

Second, SA Lucas said there was a possibility that the storage houses had limited quantities of drugs.

Third, SA Lucas said that the successful execution of search warrants would have only yielded controlled substances, not evidence to identify co-conspirators or the scope of the conspiracy.

Finally, SA Lucas said that without electronic surveillance, law enforcement agents would not know when members of the organization received cocaine. Therefore, a search warrant would not have ensured that evidence would be found in the place searched.

### 2.   Undercover Agents

SA Lucas said he considered using undercover agents, but did not believe this option was viable because: (1) the confidential sources said the introduction of an undercover agent could not be accomplished; (2) the undercover agent could not obtain direct evidence because the subjects would have been suspicious of a new individual; (3) an attempt to introduce an undercover agent into the organization would have endangered the confidential sources, or at least cut-off the information they received from the subjects; and (4) the "cold" introduction of an undercover agent would have been too dangerous to attempt.  Based on the identities and nature of the subjects, SA Lucas believed they might have harmed the undercover agent.

Accordingly, SA Lucas concluded that "no undercover agent can, at this time, infiltrate the inner workings of this organization and this technique cannot be utilized in this case."

12

### 3.    Interviews

SA Lucas said interviewing knowledgeable parties was not feasible for four reasons: (1) the interviewees would have alerted the subjects and other associates that law enforcement officials were interested in their activities; (2) attempts to interview individuals would have defeated the purpose of the investigation because Bracey's associates appeared to be involved in criminal activity; (3) it was likely that the subjects would have invoked their privilege against self-incrimination; and (4) it was unlikely that Bracey would have cooperated, because he was arrested several times in the past and did not cooperate with law enforcement.

### 4.    A Grand Jury Investigation

SA Lucas said testimony before a Grand Jury would not have succeeded because: (1) participants in the conspiracy would have invoked their privilege against self incrimination; (2) granting immunity to a sufficient number of co-conspirators in exchange for their testimony would not have been in the best interest of justice; (3) grants of immunity to the key participants would have resulted in avoidance of criminal responsibility; (4) it was unlikely that the key participants would have incriminated their associates, if they were granted immunity; (5) immunity to the key participants would not have ensured fruitful testimony; (6) giving a subpoena to the key participants would have alerted others involved in drug trafficking that an investigation was in progress; and (7) many of the participants in the conspiracy had strong links to other criminal organizations.  According to SA Lucas, disclosure of the investigation through Grand Jury subpoenas would have caused others to conceal their activities.

13

### 5.     "Trash Pulls"

SA Lucas considered conducting "trash pulls" at houses that were suspected of being used in the conspiracy.  However, SA Lucas said: (1) it was difficult to execute "trash pulls" in a secure and safe manner in densely populated areas; (2) in most instances, the risk of detection outweighs the value of the evidence that might be obtained; (3) it was likely that counter-surveillance would have alerted the subjects that they were the focus of law enforcement attention; and (4) even if "trash pulls" could be executed without danger to the agents and without disclosure of the investigation, there is an evidentiary shortcoming in that evidence obtained from "trash pulls" cannot always be attributed to a specific subject.

### E.     Defendants' Arguments

According to Defendants, SA Lucas's Affidavits did not contain enough specificity to allow the Court to determine whether there was a need to authorize the interception of telephone calls.  Defendants say: (1) the Affidavits contain boilerplate, generic representations found in all wiretap applications; (2) the Affidavits demonstrate that normal investigative techniques were productive, eliminating the necessity of a wiretap; and (3) the investigation was of a "garden variety" drug case that could be infiltrated through the use of traditional techniques.

### 1.     Confidential Sources

Defendants argue that: (1) SA Lucas's statements that he could not fully identify all participants in the organization, dismantle the organization, or prosecute all of the participants contradict the confidential sources' identification of at least three other

14

participants as well as their statements that they witnessed or participated in illegal drug transactions; (2) SA Lucas's Affidavit does not state why the confidential sources – who were paid to cooperate – were unwilling to testify, or why the Government could not and/or would not subpoena their testimony; and (3) SA Lucas's statement that the confidential sources were unable to provide more than identifying and historical information contradicts the assistance and information provided by the confidential sources. Defendants say Source One provided information concerning the location of illegal drugs, and both Source One and Source Two made controlled drug purchases from Bracey, recorded Bracey during the purchases, and identified other participants in Bracey's organization. Defendants say the Government cannot create the need for a wiretap by discontinuing the use of confidential sources.

### 2.    Physical Surveillance and "Trash Pulls"

Defendants say SA Lucas did not have conclusive evidence that the subjects employed counter-surveillance methods. According to Defendants, even if this were true, SA Lucas never said the agents could not follow the subjects.

Further, Defendants say SA Lucas did not have conclusive evidence that a "trash pull" on Bracey or any other participant would have been unsuccessful.

Finally, Defendants say SA Lucas's conclusion that physical surveillance failed is meritless because in reality, physical surveillance efforts were successful.

### 3.    Search Warrants

Defendants say that SA Lucas's conclusion that the execution of search warrants would not have yielded evidence which would permit the identification of co-conspirators

15

is baseless because he neglected any attempt to execute a search warrant.

### 4.   Undercover Agents

Defendants say SA Lucas did not provide reasons for his conclusion that the subjects of the investigation would have been suspicious of an undercover agent.

Further, Defendants say that the Government's argument that Bracey's convictions for carrying a concealed weapon and assault on a prison employee as well as his acquittal on an armed robbery charge, support SA Lucas's assertion that Bracey or any of the other identified subjects might have harmed the undercover agent is insufficient.  Defendants rely on *United States v. Rice*, 478 F.3d 704 (6th Cir. 2007) to support their argument.

In *Rice*, the Court mentioned that the district court found "the bald statement that '[m]embers of this criminal organization . . . routinely carry firearms and wear bullet-resistant vests'[sic] does not provide sufficient information to the magistrate about [] Rice to determine whether physical surveillance was too dangerous to be attempted." *Rice*, 478 F.3d at 707.

It should be noted that defense counsel disputes that Bracey was convicted of assault on a prison employee.

### 5.   Interviews and Grand Jury Investigation

Defendants say SA Lucas's reasons for rejecting interviews and a Grand Jury Investigation were based on unsupported conclusive statements and SA Lucas's opinions.   Defendants say both confidential sources were paid informants; therefore, there is no reason why those individuals could not have been brought before the Grand

Jury through a subpoena and their testimony taken.

Further, Defendants argue that while Bracey did not cooperate in the past, it was possible that other individuals may have cooperated.

### F.   Government's Response

The Government says: (1) SA Lucas's Affidavits are not boilerplate; and (2) reading the necessity paragraphs in a "practical and common sense fashion" establishes that they meet the appropriate legal requirements.

#### 1.   Confidential Sources

According to the Government: (1) SA Lucas's Affidavits correctly state that the use of confidential sources was insufficient to indict and convict Bracey and his co-defendants; (2) Defendants do not cite case law that says that the Government must specify why the confidential sources believed they would be in danger if they testified; (3) the only relevant fact is that the confidential sources would not testify; and (4) the reason why they would not testify is irrelevant because their refusal to testify renders most of their information, including the controlled drug purchases, inadmissible at trial.

Further, the Government says SA Lucas could not have subpoenaed the testimony of the confidential sources because confidential sources give information premised on promises of confidentiality, and a practice of routinely serving subpoenas on confidential sources will eliminate them as a source of information.

#### 2.   Physical Surveillance and "Trash Pulls"

The Government says the fact that Bracey was observed in the presence of a drug dealer does not mean that continued surveillance would have led to a prosecutable

17

case.

In addition, the Government says Defendants ignore SA Lucas's statement that "trash pulls" are particularly difficult in heavily populated areas, and his statement that evidence obtained during "trash pulls" is frequently of limited value.

### 3.    Search Warrants

The Government says it could not have effectuated a search warrant without probable cause to believe drugs were in Bracey's house or car at a particular time.

### 4.    Undercover Agents

The Government says the issue of an undercover operation is moot because no one was capable of introducing an undercover agent into the organization.

### 5.    Interviews and Grand Jury Investigation

The Government says the law does not require agents to attempt interviews or subpoena individuals to prove those acts are unavailing.  In addition, the Government says that contrary to Defendants' argument, SA Lucas provided factual support for his belief that attempts to interview subjects involved in the drug organization or to call them before the Grand Jury were unlikely to yield significant results.

### G.    Analysis

SA Lucas does use generic language in his Affidavits.  Such generic language is used in describing:  (1) the reasons provided in the pen register data and toll records section, the Grand Jury investigation section, and the "trash pulls" section; (2) the majority of the reasons provided in the undercover agents section; and (3) some of the reasons in the interview section.

18

Nevertheless, the Government met its low burden of proof. *See Lambert*, 771 F.2d at 91. The Affidavits were not purely boilerplate nor was the Government required to prove that it exhausted all avenues of investigation. *See Landmesser*, 553 F.2d at 20; *Alfano*, 838 F.2d at 163-64.

Further, the Court considers that the subjects routinely relied on the telephone to conduct the criminal enterprise under investigation. *See Landmesser*, 553 F.2d at 20.

Finally, the Court is not required to deny a wiretap application because some investigative techniques were successful in uncovering some evidence of wrongdoing. *See United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002).

The Court now addresses the second argument raised by Defendants, that the Government presented false information to the Court, hampering the Court from determining whether the Government complied with its duty to minimize.

## V.   THE DUTY TO MINIMIZE THE INTERCEPTION OF COMMUNICATIONS NOT SUBJECT TO INTERCEPTION, 18 U.S.C. §2518(5)

Under 18 U.S.C. §2518(5):

> Every order and extension thereof shall contain a provision that the authorization to intercept . . . shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter[.]

The September 28, 2005 Order authorizing the interception of wire communications as well as the October 31, 2005 extension Order say:

> this authorization to intercept wire communications shall be . . . conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code. Interceptions will be minimized when it is determined through voice identification, physical surveillance or otherwise that none of the named interceptees or their confederates, when identified, are participants to the conversation, unless it is determined the conversation is

19

criminal in nature.  The agents will, however, spot monitor to determine
that the conversations have not become criminal in nature.

In addition, SA Lucas's Affidavits say:

All of the interceptions will be minimized in accordance with Chapter 119,
Title 18, United States Code.  Interceptions will be minimized when it is
determined through voice identification, physical surveillance or otherwise
that none of the named interceptees or their confederates, when identified,
are participants to the conversation, unless it is determined the
conversation is criminal in nature.  Interceptions will be suspended when it
is determined that conversations are not criminal in nature.  Intermittent
spot monitoring will be utilized to ensure that a minimized conversation
has not become criminal in nature.  Interceptions of a privileged nature
(e.g. attorney/client, priest/penitent, etc.) will also be immediately
minimized upon discovery of the nature of those conversations.

The Order authorizing the interception of wire communications as well as the

October 31, 2005 extension Order required agents to file Progress Reports within a

reasonable time after the tenth, twentieth, and thirtieth days following the first date of

interception.  The Progress Reports showed what progress was made towards

achievement of the authorized objectives and the need for continued interception.

Defendants have the burden of production and persuasion concerning

compliance with the duty to minimize.  *See United States v. Giacalone*, 853 F.2d 470,

482 (6th Cir. 1988) ("the law is clear in this circuit that 'the burden of production and

persuasion rests on the person seeking to suppress evidence'") (quoting *United States*

*v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986)).

Distinguishing *United States v. Baranek*, 903 F.2d 1068 (6th Cir. 1990); and,

relying on *United States v. George*, 465 F.2d 772 (6th Cir. 1972) as well as the Court's

power to sanction parties who present false or misleading information to the Court,

Defendants ask the Court to suppress all of the wiretap evidence.  They say a

20

comparison between the Progress Reports submitted to the Court and the notations in the synopsis section of the line sheets provided in discovery shows Progress Reports inflated the number of minimized calls.

According to Defendants:

(1)     the Progress Report for September 29, 2005 through October 8, 2005 shows 90 minimized calls; the line sheets show 30 minimized calls.

(2)     the Progress Report for October 9, 2005 through October 18, 2005 shows 97 minimized calls; the line sheets show 22 minimized calls.

(3)     the Progress Report for October 19, 2005 through October 28, 2005 shows 133 minimized calls; the line sheets show 49 minimized calls.

(4)     the Progress Report for October 31, 2005 through November 9, 2005 shows 101 minimized calls; the line sheets show 25 minimized calls.

(5)     the Progress Report for November 10, 2005 through November 19, 2005 shows 90 minimized calls; the line sheets show 37 minimized calls.

(6)     the Progress Report for November 20, 2005 through November 29, 2005 shows 94 minimized calls; the line sheets show 28 minimized calls.

In sum, Defendants say the Government falsely, or with reckless indifference, represented to the Court that the agents minimized 605 calls when the line sheets represent only 191 minimized calls.  According to Defendants, this misrepresentation prevents the Court from insuring proper minimization in the implementation of these wiretaps.

The Government says that the assumption underlying Defendants' argument is that the agents did not minimize calls that do not have a notation in the synopsis section of the line sheets.  According to the Government, that is a false assumption because the intercepting agents did not, as a matter of course, place notations on the line sheets for all minimized calls.

21

Further, the Government says that even if the Progress Reports are incorrect, Defendants cannot support a claim that the Government ignored its duty to minimize the interceptions, and Defendants did not cite authority which allows the Court to suppress the wiretap evidence for filing false Progress Reports.

The Court finds Defendants do not have enough information to evaluate the Governments' compliance. *See Giacalone*, 853 F.2d at 482. For example, Defendants cannot determine the purpose of the Line Sheets or what documents the Government used to compile the information recorded on the Progress Reports and submitted to the Court.

The Court will conduct an evidentiary hearing to determine the monitoring agents' duties and the process the Government used to compile the Progress Reports. Defendants must be mindful, however, that even if the Court determines the Government did not comply with its duty to minimize, the remedy Defendants seek may be too broad. *See United States v. Cleveland*, 964 F.Supp. 1973, 1091 (E.D. La. 1997) (the appropriate remedy for failing to comply with the minimization requirement is exclusion of those interceptions that were improperly obtained, not total suppression of the electronic surveillance) (citing *United States v. Gaytan*, 74 F.3d 545 (5th Cir. 1996); *United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972); *United States v. Gassiraro*, 1986 WL 13072 (D.Mass. Nov. 4, 1986)). "Those courts that have allowed the remedy of complete suppression have done so only when there were violations of 'egregious magnitude,' which were in 'flagrant disregard' of the duties of minimization." *Cleveland*, 964 F.Supp. at 1091-92 (citing *United States v. Lamantia*, 1996 WL 559950 (N.D.Ill Sept. 30, 1996)).

22

**VI.     CONCLUSION**

Defendants' motion is **DENIED IN PART**.  The Court finds the Government met

the necessity requirement before seeking a wiretap.  Defendants' motion is **DENIED** on

that basis.

The Court will conduct an evidentiary hearing on minimization **on**

**SEPTEMBER 22, 2009 AT 9:00 AM.**

**IT IS ORDERED**.


                                        s/Victoria A. Roberts                              
                                        Victoria A. Roberts
                                        United States District Judge

Dated:  July 17, 2009

The undersigned certifies that a copy of this
document was served on the attorneys of
record by electronic means or U.S. Mail on
July 17, 2009.

s/Carol A. Pinegar                       
Deputy Clerk