UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff(s),        CASE NUMBER: 06-20185
                                                 HONORABLE VICTORIA A. ROBERTS

v.

ROY CHRISTOPHER WEST,
MARCUS LAMONT FREEMAN,
MICHAEL ELDREN BRACEY,
ALVINO DEWIGHT CORNELIUS,
ALSEDDRICK DEWUNN WEST,

        Defendant(s).
_____/

ORDER

I.    INTRODUCTION AND BACKGROUND

Leonard Day was shot on December 20, 2005. Shortly after the shooting, Day made statements in response to questions Officer Kenneth Bresinski asked him in the ambulance on the way to the hospital. Day told Officer Bresinski: (1) his name was Eric Smith; (2) a 4-door Bonneville was at the scene of the shooting; (3) Roy West shot him; (4) his necklace was taken in a robbery; and (5) Roy's address. In addition, Day provided Officer Bresinski a physical description of Roy and Roy's approximate age.

On January 21, 2009, Roy filed a "Motion to Preclude the Introduction of any Statements of Leonard Day After he was Shot on December 20, 2005." (Doc. #253). Roy seeks an order prohibiting the Government and his co-Defendants from introducing such statements at trial.

Marcus Freeman wants the statements introduced at trial. Freeman denies he

1

shot Day and says Day's statements are exculpatory as to him. Freeman relies on his Fifth and Sixth Amendment rights to offer evidence in support of his defense. He also relies on the Federal Rules of Evidence (dying declaration under Fed. R. Evid. 804(b)(2) and excited utterance under Fed. R. Evid. 803(2)).

An evidentiary hearing was held on September 22, 2009.

Previously, the Court entered an Order prohibiting the introduction of Day's statements as to Roy, Michael Bracey, Alvino Cornelius, and Alseddrick West based on their stipulation that the statements would not be admissible at trial.

Roy's motion is **DENIED** as to Freeman. While Day's statements do not qualify as a dying declaration, they do meet the excited utterance requirements.

## II.   APPLICABLE LAW AND ANALYSIS

Freeman has the burden to prove by a preponderance of the evidence that Day's statements qualify as an hearsay exception under the Federal Rules of Evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). A "preponderance of the evidence" means Freeman must prove it is more likely than not that Day made a dying declaration or an excited utterance. *See United States v. Dixon*, 2008 WL 282745 at **7 (6th Cir. Feb. 1, 2008) (citing *United States v. Moses*, 289 F.3d 847, 852 (6th Cir. 2002)).

### A.   Excited Utterance

Fed. R. Evid. 803(2) says:

A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition [is not excluded by the hearsay rule].

Freeman has the burden to prove by a preponderance of the evidence that: (1) Day was involved in an event startling enough to cause nervous excitement; (2) Day's statement was made before he had time to contrive or misrepresent; and (3) Day's statement was made while Day was under the stress of the excitement caused by the event. *See Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1057 (6th Cir. 1983).

The Court need not address the first and third elements; those elements are undisputed.

The Government says Freeman cannot satisfy the second element. According to the Government, not only did Day have the time to contrive or misrepresent – he actually misrepresented his name and his statement that Roy West was the shooter. The Government says: (1) Day could not see his shooter because it was dark outside, and he was shot from the side and the back; and (2) Roy was in Akron, Ohio at the time of the shooting. The Government says Day's misrepresentations show his statements do not bear any indicia of reliability and should not be admissible.

In determining whether Freeman met his burden to prove it is more likely than not that Day made the statements before he had time to "contrive or misrepresent," the Court focuses on whether Day had the opportunity to contrive or misrepresent in light of the circumstances of the event. *See Maggard v. Ford Motor Co.*, 2009 WL 928604 at *4 (6th Cir. April 7, 2009) (citations omitted). One of the most relevant factors in determining spontaneity is the length of time between the event and the statement. *Haggins*, 715 F.2d at 1057.

It is important to remember, however, that "the ultimate question is

3

whether the statement was the result of reflective thought or whether it was a spontaneous reaction to the exciting event." Thus, a court must take into account other factors that could affect spontaneity. For example, the declarant's age or physical or mental condition might indicate that a statement is not the result of reflection even if it was made some time after the exciting event.

Thus, "[p]hysical factors such as shock, unconsciousness or pain, may prolong the period in which the risk of fabrication is reduced to an acceptable minimum."

*Id.* at 1058 (citations omitted).

Officer Bresinski testified at the evidentiary hearing that he arrived at the scene within 3-5 minutes of receiving the call that a shooting occurred. When Officer Bresinski arrived, he noticed Day was not moving, and he was seriously injured. Officer Bresinski asked Day questions about the circumstances of the shooting shortly after he arrived on the scene. When Day answered Officer Bresinski's questions, Officer Bresinski could tell he was in pain and agony.

Based on: (1) the short period of time that elapsed between the shooting and when Day made the statements; and (2) the amount of pain Officer Bresinski testified Day was in when he made the statements, it is more likely than not that Day made the statements before he had time to engage in reflective thought.

Freeman met his burden to prove Day's statements qualify as an excited utterance. As such, Freeman's statements are considered inherently truthful. *See Haggins*, 715 F.2d at 1057 (excited utterances "have long been recognized as exceptions to the general rule prohibiting hearsay because they contain inherent guarantees of truthfulness"); *see also* Jeffrey S. Siegel, *Timing Isn't Everything: Massachusetts' Expansion of the Excited Utterance Exception in Severe Criminal*

*Cases*, 79 B.U. L. Rev. 1241, 1247 (1999):

> Despite the desire to ensure reliable evidence by excluding hearsay, exceptions to the rule have developed because "under appropriate circumstances[,] a hearsay statement may possess circumstantial guarantees of trustworthiness" sufficient to justify introducing it into evidence. The actual truthfulness of a specific statement is not at issue; rather the inquiry centers on whether that particular type of statement possesses an acceptable risk of inaccuracy to justify the statement's admission.

(Citations omitted).

Nonetheless, the Government says it has substantial evidence – including 12 wiretap calls – to establish that it was impossible for Roy to shoot Day because Roy was in Akron, Ohio at the time of the shooting. In addition, the Government says Day's statements are not credible, considering he lied about his name. Finally, the Government relies on *Brown v. Keane*, 355 F.3d 82 (2nd Cir. 2004) for its proposition that the personal knowledge of the witness must be demonstrated before the so-called evidence is admissible, and Freeman did not demonstrate that Day was in a position to see the shooter.

In *Keane*, the district court admitted a tape recording of an anonymous 911 telephone call in which the caller told the police two light-skinned black guys in green coats were shooting at a bar. *Keane*, 355 F.3d at 85. The caller did not see the shooting; the caller only saw the men leave a grocery store with guns and heard gunshots. *See id.* at 85, 90.

On appeal, the *Keane* court held that the 911 call was not admissible under the excited utterance exception to the hearsay rule because the caller's statement was not based on personal knowledge. *Id.* "It is one of the most basic requirements of the law

5

of evidence that a witness's report may be admitted only where grounds exist for 'a finding that the witness has personal knowledge of the matter' to which the statement relates." *Id.* (citing Fed. R. Evid. 602).

Unlike the Second Circuit in *Keane*, the Sixth Circuit does not require Day to personally observe the shooter in order for the Court to admit Day's statements as an excited utterance.

In *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784 (6th Cir. 2005), less than two minutes after takeoff, the pilot of a helicopter said "I think my gyro just quit." *Greene*, 409 F.3d at 787. The helicopter then crashed into a wooded hillside, and the pilot was killed. *Id.* at 786. The district court admitted the pilot's statement as an excited utterance. *Id.* at 790.

The Sixth Circuit upheld the district court's decision:

> To the extent that [defendant] argues . . . that [the pilot] could not physically see the gyroscope that allegedly quit, the Advisory Committee Notes to Fed. R. Evid. 803 provide that, with respect to a declarant's perception of an event, "the statement need only 'relate' to the startling event or condition, thus affording a broader scope of subject matter coverage."

*Id.* at 790-91; *see also Compos v. MTD Products, Inc.*, 2009 WL 425012 at *11 (M.D. Tenn. Feb. 19, 2009) ("The Sixth Circuit has not required that the declarant observe the startling event in order for his statement to be admissible as an excited utterance") (citing *Greene*, 409 F.3d at 790-91).

More importantly, there was a discussion at the evidentiary hearing concerning what Day meant when he said his necklace was taken in a robbery. Freeman's position is that Day meant the shooter took his necklace in a robbery that occurred

6

simultaneously with the shooting. The Government's position is that Day was referring to a robbery at a club that occurred a week before the shooting. If the jury accepts Freeman's version of events, it could conclude that the shooter was close enough to Day for Day to personally observe the shooter when he took Day's necklace.

Further, once Freeman establishes that Day's statements qualify as an excited utterance, the statements are admissible despite the fact that there may be questions concerning their reliability. The Government's challenges to the reliability of Day's statements go to the weight the jury gives Day's statements – not their admissibility.

In *United States v. Hadley,* 431 F.3d 484 (6th Cir. 2005), the defendant's wife told a police officer that the defendant had a gun. That statement was admitted as an excited utterance, and the defendant was found guilty of being a felon in possession of a firearm. *Hadley*, 431 F.3d at 486-87, 495-96. The defendant argued that his wife's statement lacked the "inherent guarantees of truthfulness" that typically accompany statements admitted under the hearsay exception for excited utterances because at sentencing, the wife denied that she observed defendant with a weapon. *Id.* at 497-98.

The Sixth Circuit held that:

a statement that satisfies all of the elements of our test for excited utterances meets the threshold for admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as inconsistency with subsequent statements or the speaker's motive to fabricate.

. . . .

Any challenges to the reliability of the[] statements would go to . . . weight rather than . . . admissibility - the jury was certainly entitled, for example, to credit the testimony of the defense witnesses that they did not see [d]efendant with a gun that evening.

*Id.* at 498.

Similarly, in *United States v. Davis*, 577 F.3d 660 (6th Cir. 2009), a woman saw the defendant holding a gun. The woman called 911. Even though she only saw one gun, the woman told the 911 dispatcher that the defendant had two guns because she thought the police would respond quicker. *Davis*, 577 at 664. The district court admitted the statement as an excited utterance. *Id.* at 668.

The Sixth Circuit held that:

> There is some question as to whether the 911 call meets the second prong of the *Haggins* test, that is, whether the statement was made before there was time to contrive or misrepresent. Despite the small amount of time between witnessing the event and the 911 call, there were certain acknowledged "exaggerations" in [the woman's] 911 call. [For example, the woman] told the 911 dispatcher that [d]efendant had two guns, instead of the one she testified to[.] The[] exaggerations, however, do not preclude the applicability of the excited utterance exception under *Haggins*'s second prong. As this circuit has previously held, "a statement that satisfies all of the elements of our test for excited utterances meets the threshold for admissibility under Rule 803(2), even though its reliability might be subject to challenge on such grounds as inconsistency with subsequent statements or the speaker's motive to fabricate." *United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005). Here, the statement meets the second *Haggins* prong because [the woman] made the 911 call only moments after witnessing the event. The fact that she later stated she made "exaggerations" goes to the weight, not the admissibility of the 911 call. *See id.* ("Any challenges to the reliability of these statements would go to their weight rather than their admissibility . . ."). Thus, we conclude that the 911 call was properly admitted as an excited utterance[.]

*Id.* at 679-70.

The Government may introduce its evidence at Freeman's trial that Day lied about his name as well as its evidence to support its position that Roy was in Akron, Ohio at the time of the shooting. The Government may also question witnesses about the manner in which Day was shot, and the lighting conditions when Day was shot. Freeman may introduce his evidence that Day, an eyewitness, identified Roy as the

shooter. The jury will determine the credibility of the evidence. *See Brock v. Caterpillar, Inc.*, 94 F.3d 220, 226 (6th Cir. 1996) ("It is the duty of the jury to weigh the evidence and make credibility judgments") (citing *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 535 (6th Cir. 1995)).

The Court notes that the Government's position that it was impossible for Roy to have shot Day because it has wiretap evidence that proves Roy was in Ohio at the time of the shooting, is similar to an alibi situation in which a defendant says it was impossible for him to have committed the crime because he was at a different location when the crime occurred. An alibi defense would not be precluded unless it was irrelevant or a waste of judicial time, nor would the Government be precluded from introducing admissible and relevant evidence that shows defendant was the perpetrator. Similarly, simply because the Government says it has wiretap evidence that proves Roy was in Ohio at the time of the shooting does not mean Freeman is precluded from introducing Day's excited utterance that Roy was the shooter, which is relevant to Freeman's defense that he was not the shooter.

**B.     Dying Declaration**

Fed. R. Evid. 804(b)(2) says:

> In a prosecution for homicide . . ., a statement made by a declarant while
> believing that the declarant's death was imminent, concerning the cause
> or circumstances of what the declarant believed to be impending death [is
> not excluded by the hearsay rule].

*See also Shepard v. United States*, 290 U.S. 96, 99 (1933) (a dying declaration must be made not in contemplation of possible or even likely death, but in the face of imminent and apparently certain death; that is, the statement must be made in the "shadow of

impending death.").

Freeman may show it is more likely than not that Day believed his death was imminent by what Day said; by evidence concerning the nature and extent of Day's wounds as suggesting Day must have felt or known that he could not survive; or, from Day's conduct at the time and the communications, if any, that were made to him by his medical advisers, if assented to or understandingly acquiesced in by him. *See Mattox v. United States*, 146 U.S. 140, 151 (1892).

Freeman relies on the nature and extent of Day's wounds in an attempt to meet his burden. To support his argument, Freeman introduced Officer Bresinski's Crime Report, 10 photographs, Officer Velma Tutt's Evidence Technician Report, and the Medical Examiner's Report. In addition, Freeman presented testimony from Officer Bresinski, Officer Tutt, and Officer Carl Mack.

**Officer Kenneth Bresinski's Testimony**

Officer Bresinski testified that when he arrived at the scene of the shooting, Day sat motionless in the driver's seat of a blue Tahoe. According to Officer Bresinski: (1) the driver's side window was shattered; (2) the passenger side window was broken; (3) the rear window was broken; (4) there were multiple bullet holes in the passenger side door behind the driver's door, the side of the Tahoe, and the back of the Tahoe; and (5) there were several spent casings from a weapon around the Tahoe and in the driveway.

Based on the condition of the Tahoe, the blood on Day, the fact that Day was motionless, and his observation that Day sustained four gunshot wounds, Officer Bresinski believed Day was seriously injured.

Medic 24 pulled Day out of the Tahoe, placed him on a stretcher, and put him in

an ambulance. Officer Bresinski entered the ambulance to obtain information from Day. According to Officer Bresinski, Day's trauma, shortness of breath, and pain and agony made it difficult for Day to answer questions and for Officer Bresinski to understand Day's answers. Officer Bresinski said Day appeared to do the best he could given his critical condition.

While Officer Bresinski does not recall EMS technicians giving Day oxygen or an IV, he testified that the technicians worked quickly in an attempt to keep Day alive. According to Officer Bresinski, EMS technicians rushed to the hospital and provided medical care to Day the entire ride from the scene of the shooting to St. John's Hospital.

Officer Bresinski testified that he did not believe Day was going to die. Indeed, both he and an EMS technician encouraged Day and told him he would be fine. Nonetheless, Officer Bresinski thought Day believed he was going to die. He was not questioned about the reason he held this belief about what Day believed.

**Officer Kenneth Bresinski's Crime Report**

Officer Bresinski's Crime Report says when Day arrived at the hospital, Dr. Pena noted his condition as critical. In addition, Officer Bresinski noted that Day was shot in the right ankle, the left tricep, and twice in the left rear torso under his armpit.

**Officer Velma Tutt's Testimony and Photographs**

Officer Tutt testified that she took the 10 photographs of the blue Tahoe that Freeman introduced into evidence. Officer Tutt said the photographs show: (1) the driver's side window of the Tahoe was broken out; (2) eight bullet holes in the rear door on the driver's side; (3) two bullet holes in the passenger side window; (4) the

11

passenger side window was shattered; (5) two bullet holes in the rear window; and (6) five bullet holes in the tailgate.

In addition, Officer Tutt testified that there were approximately 39 spent casings at the scene, five bullet fragments, and two fired bullets.

**Officer Velma Tutt's Evidence Technician Report**

Officer Tutt's Evidence Technician Report says: (1) spent casings and fired bullets were in the street, on the South end of the driveway, and on the sidewalk; (2) a fired bullet was on the ground outside the driver's side door; (3) a bullet fragment was in the snow; (4) there were four bullet holes in the tailgate of the Tahoe, two bullet holes in the rear window, three bullet holes in the wheel well above the rear tire on the driver's side, 14 bullet holes in the driver's side rear door, two bullet holes in the front passenger window, one bullet hole in the passenger window on the driver's side, and one bullet hole in the driver's side rear view mirror; (5) the rear tire on the driver's side was flat; (6) the driver's side window was broken out; (7) the front passenger side window was shattered (but still intact); (8) the mirror casing to the outer rear view mirror was on the ground outside the front passenger side door; and (9) bullet strike marks were at the South and East sides of the location.

**Officer Carl Mack's Testimony**

Officer Mack testified that there were 40-50 shell casings at the scene of the shooting.

**Medical Examiner's Report**

The Medical Examiner's Report says Day arrived at St. John's Hospital on

December 20, 2005 at 6:53 p.m., and he was pronounced dead on December 21, 2005 at 12:50 a.m.

According to the report, when Day arrived at the hospital, he was placed in the Surgical Intensive Care Unit where he continued to deteriorate and eventually died. The Medical Examiner noted Day's organs were pale and bloodless.

The Postmortem Report says Day died of five gunshot wounds. There were two gunshot wounds to Day's left abdomen, one gunshot wound to Day's left shoulder, one to his left chest, and one to his right foot. There was no evidence of close range firing present on Day's skin surrounding the gunshot wounds.

**The Court's Findings**

The Court evaluated all of the evidence presented and finds that Freeman did not meet his burden to prove it is more likely than not that Day made the statements when he either felt or knew he could not survive.

First, the fact that Day suffered five gunshot wounds and was in critical condition does not mean it is more likely than not that Day felt or knew he could not survive. Indeed, the ambulance arrived shortly after Day was shot, and the EMS technicians worked quickly in an attempt to keep him alive; they rushed Day to the hospital, and provided Day medical care the entire ride from the scene of the shooting to the hospital.

Second, both Officer Bresinski and an EMS technician told Day he would survive, and there is no evidence to support Officer Bresinski's impression that Day believed he was going to die.

Third, Day survived for approximately 6.5 hours after the shooting.

Finally, this case is distinguishable from *United States v. Etheridge*, 424 F.2d 951

13

(6th Cir. 1970), a case Freeman relies on.

In *Etheridge*, the district court judge concluded that a co-defendant's statements qualified as a dying declaration because he was shot five times in the head and body, he drove to a stranger's house and blew the horn to get someone's attention, he got out of the car and leaned over against the car door before making his way to the front porch and knocking on the door, and he referred to God or the Lord before identifying his shooter. The reported decision in *Etheridge* also says the victim's own statements indicated that he contemplated death, and that he died very shortly after making the declaration. *Etheridge*, 424 F.2d at 965-66. Based on the totality of the circumstances, the Sixth Circuit held that the district court judge was well within his discretion to admit the dying declaration. *Id.* at 965.

While Day was shot five times and was seriously injured, the totality of the circumstances does not lead the Court to conclude that Day's statements were made in the shadow of impending death.

### III.    CONCLUSION

Roy's motion to preclude the introduction of Day's statements is **DENIED** as to Freeman. Day's statements qualify as an excited utterance, and Freeman may introduce the statements at trial.

**IT IS ORDERED**.

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

14

Dated:  October 6, 2009

| |
|---|
| The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 6, 2009.<br><br>s/Carol A. Pinegar<br>Deputy Clerk |